Filed 1/23/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| LYNETTE MACKEY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, <br><br> Defendant and Respondent. | D072198 <br><br><br> (Super. Ct. No. 37-2015-00011529-CU-CR-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County,

Joan M. Lewis, Judge.  Reversed.


Law Offices of John L. Burris, John L. Burris, Ayana Curry; Benjamin Law

Group and Na'il Benjamin for Plaintiffs and Appellants.

Andrews LaGasse Branch & Bell, Margaret C. Bell and Shauna L. Sinnot for

Defendant and Respondent.

Five African-American women on the basketball team at California State University at San Marcos (CSUSM) sued head coach Sheri Jennum and the Board of Trustees of the California State University, claiming Jennum had engaged in race-based discrimination and retaliation. They alleged she derogatorily referred to them as "the group," reduced their playing time, afforded them fewer opportunities, punished them more severely and generally singled them out for harsher treatment as compared to their non-African-American teammates. The trial court granted both motions for summary judgment filed by the Board, concluding plaintiff Danielle Cooper's claims were untimely and that the remaining plaintiffs could not show a triable issue on the merits.[1]

On plaintiffs' appeal from that ruling, we reverse the order granting summary judgment and direct the court to enter a new order granting summary adjudication on some, but not all, of plaintiffs' claims. Plaintiffs cannot sue the Board under 42 United States Code sections 1981 and 1983 because CSUSM is not a "person" subject to suit under those statutes.[2] That disposes of Cooper's sole contention on appeal that her claim under section 1981 is timely.

Turning to the remaining claims brought by the four "freshmen plaintiffs," summary adjudication is improper as to their racial discrimination claims under title VI of the Civil Rights Act of 1964 (hereafter title VI) (42 U.S.C. § 2000d et seq.) and the

---

[1]     Jennum was not party to the summary judgment proceedings and is not involved in this appeal.

[2]     Statutory references are to the United States Code unless otherwise indicated; we refer to 42 United States Code 1981 hereafter as "section 1981" and 42 United States Code 1983 hereafter as "section 1983."

Unruh Civil Rights Act (Unruh Act) (Civ. Code, § 51 et seq.). Viewing the evidence, as we must, in the light most favorable to the freshmen plaintiffs, the Board did not meet its moving burden to show the lack of a triable issue as to whether these plaintiffs suffered a materially adverse action under circumstances suggesting a racially discriminatory motive.

For similar reasons, summary adjudication is improper on title VI retaliation claims brought by three of the four freshmen plaintiffs, Lynette Mackey, Kianna Williams, and Sierra Smith. Each of these women complained about Jennum's discriminatory treatment and indicated how they suffered adverse consequences as a result. We reach a different conclusion as to plaintiff Crystal Hicks, who never made a complaint and denied facing any consequences as a result of complaints made by her peers.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

Danielle Cooper played on CSUSM's women's basketball team for two years—during both the 2011–2012 inaugural season and 2012–2013 season.[4] Although she was one of the top rebounders in California, head coach Sheri Jennum reduced her playing

---

[3] "Consistent with our standard of review of orders granting summary judgment, we will recite the historical facts in the light most favorable to . . . the nonmoving party." (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 81 (*Light*).)

[4] Although "[t]he pleadings define the issues to be considered on a motion for summary judgment" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252), plaintiffs' complaint contains scant factual allegations as to Cooper. We recite facts relevant to Cooper solely to provide context; as we explain, we agree with the trial court that her claims against the Board are all time-barred.

time by the end of the first season and did not include her as frequently in the starting lineup. Jennum variously yelled at Cooper, ostracized her from her teammates, and ignored her. Cooper came to believe Jennum's treatment was race-based because she appeared to reserve harsher treatment for the two African-American players on the team.

Cooper lodged complaints with Dean of Students Dilcie Perez and Director of Athletics Jennifer Milo, but did not believe they were registered or addressed.[5] She was released from the team in April 2013 after the National Association of Intercollegiate Athletics (NAIA) concluded she had exhausted her eligibility. This came as a surprise to her; Jennum had previously told her she would have three years of eligibility.

Lynette Mackey, Kianna Williams, Sierra Smith, and Crystal Hicks (hereafter, the freshmen plaintiffs), joined the team as freshmen in the 2013–2014 season. That season, the team had at most six African-American players: the four freshmen plaintiffs, Melaya Gaines (also a freshmen), and Sherika Miller (an upper classman).[6] Of the nine freshmen joining the team, five were African-American. Williams joined as a "red shirt," meaning she expected to practice but not compete.

During a retreat in September 2013, Jennum insisted that an injured Mackey participate in a team run before she was medically cleared. Jennum did not force two injured White players to join the run. Smith had notified Jennum in advance that she

---

[5] A 2012 CSUSM investigation recommended disciplining Jennum for unprofessional behavior, including "[v]erbal, angry, emotional outbursts and physical contact with players in an attempt to get their attention or make a point."

[6] There were conflicting views as to whether Sherika Miller, an upperclassman who was captain of the team during the 2013–2014 season, was African-American.

would be late to the retreat due to an ROTC event.  When she arrived, Jennum appeared irritated and did not let her change into appropriate running shoes before the four-mile run.  Early on, Smith perceived that Jennum was being harsher toward certain players, but it did not initially register that all those players were African-American.

Things came to a head on October 20, 2013, when the team participated in a breast cancer walkathon in Balboa Park.  Team members were instructed to arrive at 7:30 a.m., but only Smith was on time.  Mackey, Williams, Hicks, and Gaines carpooled and were the next to arrive, half an hour late.  A visibly upset Jennum referred to the latecomers as "the group" and told them they could never ride together again because they were always late.  When the rest of the team (including Miller) arrived even later than "the group," Jennum did not reprimand them or tell them not to ride together.

The freshmen plaintiffs perceived Jennum's comments that day as "racial" or "discriminatory" because they had never previously been late and had arrived earlier than almost everyone else.  Williams and Smith wondered if Jennum based her comment on a stereotype that African-Americans were "always late."  No one else on the team had nicknames, but all the African-American players were lumped together as "the group."

From that point, Jennum's treatment of the freshmen plaintiffs became harsher. They perceived differential treatment compared with their non-African-American peers, ranging from splitting them up when they stood or sat together, picking on them or yelling at them more, pulling them out of practice, and limiting their playing time at games.  The freshmen plaintiffs felt they received fewer opportunities and had less leeway for mistakes than non-African-American players at the same seniority and skill

5

levels. Jennum "continued to use the term 'The Group' to specifically refer to the black players on the team, and it was usually used in a negative connotation."

Mackey met with Milo around November 12 to discuss how Jennum was treating her and the other "group" members. Although Milo remembered Mackey as saying, "she did not think that this treatment was related to her race," Mackey recalled communicating the exact opposite. At the end of their meeting, Milo brought Jennum into the discussion. Jennum explained why she had made certain coaching decisions, and they seemed to end the meeting on a positive note.

After the next practice, however, Jennum convened a team meeting. Saying she had been accused of being a racist, she put each player on the spot and asked each individually if she agreed with that assessment. The freshmen plaintiffs viewed Jennum's actions as divisive and confrontational. When their turns came to speak, Williams and Smith stated they did not believe Jennum was a racist, but she did appear to discriminate against some players or treat some players differently. Both later explained they were reluctant to accuse Jennum of racism, but could not identify any commonality other than race to explain why certain players were targeted and not others. Jennum responded to Williams by claiming her reference to African-American players as "the group" during the walkathon was just sarcasm.

After this "Am I racist?" meeting, Jennum's treatment of "the group" seemed to worsen. Mackey was injured earlier in the season but did not receive playing time after she was medically cleared. She disagreed with Jennum's comment that she favored one knee given her medical assessments, unencumbered participation in team passing drills,

6

and praise from the assistant coach and athletic director. Although Gaines did receive playing time, that seemed inevitable given injuries on the roster to other players at her position. Smith could not understand why she, Mackey, and Hicks "were barely getting any opportunities to just even show or make mistakes" when non-African-American freshmen got those opportunities despite not being "perfect or amazing." Williams said it "came to a point where [she] was literally just standing there on the side of practice for two hours, doing absolutely nothing."

Near the end of November, Mackey approached Dean Perez. They held a three-way meeting with Jennum to discuss rebuilding communication. Afterwards, Mackey felt little had changed. She started seeing a therapist twice a week to manage the stress. She eventually fell one credit short of maintaining eligibility. Although that was the reason she was suspended from the team on December 19, 2013, she believed she fell behind because of Jennum's discriminatory treatment. She finished her missing credit over winter break but did not rejoin the team until after Jennum's eventual departure in the spring.

As a "red shirt" Williams did not travel with the team. But from November on, Jennum prohibited her even from dribbling or shooting and only let her participate in team discipline such as "suicide" sprints. Williams felt she was denied the opportunity to improve and develop into a collegiate player. In late November, Jennum told Williams that she would be "treated accordingly to the people [she] was hanging out with" and "assumed . . . [to be] doing the same thing" as them; she construed this to mean she should no longer be friends with Mackey.

7

On December 19 Jennum brought Williams in for a meeting and told her, "We've decided you can never play for us." Williams was surprised because just a day before, Jennum and assistant coach Crystal Harris complimented her for making "good progress" after she had the rare chance to join practice. She felt her "sudden dismissal" was in retaliation for complaining and speaking out at the "Am I racist?" team meeting. After releasing Williams, Jennum sent her a barrage of text messages threatening to place a hold on her account (preventing class registration) unless she immediately returned her equipment.

Smith was a starter in high school but played only 30 seconds per game in three or four games at CSUSM. When she asked coaches why she was not playing, Jennum replied that she lacked a "fire" in her but could not elaborate. Meanwhile, non-African-American freshman at the same skill level received a lot of playing time. Smith perceived Jennum's treatment worsening after November; she yelled at "the group" more, pulled members out of practice, and canceled five of Smith's one-on-one meetings. Whereas Jennum "would let mistakes slide a couple of times" before correcting non-African-American players, Smith felt she and the other freshmen plaintiffs had "no room for error."

Smith resigned over winter break. In her exit paperwork, she indicated that she did not get playing time, was not given a valid reason why, and did not want to waste anyone's time. At deposition, she explained that she quit the team rather than face Jennum's discriminatory treatment. She felt Jennum had ruined her love for the game,

8

making her not want to return. She never reported the harassment to university officials because Jennum's treatment worsened when Mackey complained.

Hicks was quieter than the other freshmen plaintiffs. She denied making complaints about Jennum or experiencing adverse treatment from her teammates' complaints. Although she "was hardly given any playing time on the court" and perceived harsher treatment based on race, Hicks remained on the team.

In January 2014, Mackey and Williams filed formal complaints alleging Jennum had discriminated against each based on her race. CSUSM's Labor & Employee Relations investigator Lisa McLean interviewed players and coaching staff to determine whether Jennum had violated Executive Order No. 1074, a CSU-wide policy prohibiting discrimination, harassment, and retaliation against students.

In June 2014, McLean issued an investigative report rejecting a finding of racial discrimination or retaliation. She concluded that Mackey was suspended from the team for academic reasons and credited performance-based reasons offered by assistant coach Harris for Williams's release. Nevertheless, McLean determined Jennum had created a hostile environment amounting to harassment *based on race* as to both players, given her comments at the "Am I racist?" team meeting.

Based on McLean's findings, CSUSM recommended Jennum's termination. As a union member, Jennum appealed the recommendation, and a *Skelly* officer reviewed

9

McLean's findings.[7]  The officer affirmed Jennum's termination for unprofessional behavior but reversed McLean's harassment finding in part.  Although "Ms. Jennum engaged in the creation of a hostile environment" and harassed members of a protected class, he found insufficient evidence the "mistreatment was done *because* the victim is in a protected class."  Jennum ultimately filed an arbitration claim challenging her termination.  The arbitrator rejected the findings by McLean and the *Skelly* officer, found Jennum's conduct insufficient to justify her termination, and awarded back pay.

In April 2015, Mackey, Williams, Smith, Hicks, and Cooper sued Jennum and the Board, alleging: racial discrimination and retaliation in violation of title VI; racial discrimination in violation of the Unruh Act; harassment, discrimination, and retaliation under sections 1981 and 1983; and negligent supervision.  Plaintiffs asserted these same claims against Jennum, adding an additional claim for intentional infliction of emotional distress.

The Board filed two motions for summary judgment, one as to claims brought by Cooper and the other as to claims brought by the freshmen plaintiffs.  The trial court granted both motions.

It concluded Cooper's claims were time barred—Cooper did not allege any offensive or inappropriate conduct after February 2013, and her complaint was filed more

---

[7]    Pursuant to *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194, public employees are entitled to certain procedural safeguards before discipline may be imposed.  The *Skelly* review officer here considered whether there were "reasonable grounds for believing that [Jennum] engaged in the alleged misconduct and that the misconduct supports the proposed sanction."

than two years later in April 2015.  Moreover, her claims under sections 1981 and 1983 could not proceed against CSUSM, an " 'arm of the state' " that was not subject to suit under those statutes.  As to the negligent supervision claim, the court concluded Cooper could not proceed because she had not complied with the California Tort Claims Act. (Gov. Code, § 810 et seq.)

Turning to the second motion, the trial court sustained most of the Board's evidentiary objections and entered summary judgment.  The claims under sections 1981 and 1983 and for negligent supervision failed for the same reasons as did the claims brought by Cooper.  The discrimination claims under title VI and the Unruh Act could not proceed as to Mackey, Hicks, and Smith, who were not released by Jennum and therefore had not suffered an "adverse action."  Although Williams *was* released, the court concluded she failed to rebut assistant coach Harris's performance-based reason for that adverse action.  Turning to the retaliation claim, the court concluded plaintiffs could not show a triable issue absent a complaint voiced by Smith or Hicks, an adverse action taken against Mackey, or a causal link between Williams's complaints and her release from the team.

Plaintiffs appealed the order granting the Board's motions for summary judgment. We construe their premature appeal as taken from the subsequently entered judgment. (*Morales v. Coastside Scavenger Co.* (1985) 167 Cal.App.3d 731, 733, fn. 1.)

DISCUSSION

We review a summary judgment ruling de novo, "considering all of the evidence the parties offered in connection with the motion (except that which the trial court

11

properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) Summary judgment is proper if the record demonstrates there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) "In performing our review, we view the evidence in a light favorable to the losing party . . . , liberally construing her evidentiary submission while strictly scrutinizing the moving party's own showing and resolving any evidentiary doubts or ambiguities in the losing party's favor." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 859 (*Serri*).)

Cooper raises a narrow challenge to the court's ruling on summary judgment that all her claims were time-barred. She argues that her claim under section 1981 is subject to a longer statute of limitations. The freshmen plaintiffs challenge evidentiary rulings and the court's rulings on the merits as to each of their claims.

As we explain, the court properly granted summary adjudication as to all claims under sections 1981 and 1983. Because CSUSM is an "arm of the state," it is not a "person" who may be sued under those statutes. That conclusion disposes of Cooper's appeal. As to the freshmen plaintiffs' claims under title VI and the Unruh Act, we conclude the trial court erroneously sustained certain evidentiary objections and construed the "adverse action" requirement too narrowly. Defendant did not meet its burden to show the lack of a triable issue as to the bulk of these claims.

1.      *Federal Civil Rights Claims Under Sections 1981 and 1983*

Citing *Will v. Michigan Dept. of State Police* (1989) 491 U.S. 58 (*Will*), the trial court concluded the Board was "immune" from being sued under sections 1981 and 1983 because it is an "arm of the state."  We agree with the result, although the question is more precisely framed as whether the Board is, as a matter of statutory interpretation, subject to liability under those statutes.  As we explain, summary adjudication was proper as to claims brought under sections 1981 and 1983.

Title 42, section 1983 of the United States Code gives a plaintiff a private right of action against every "person" who, under color of state law, deprives the plaintiff of constitutional rights, privileges, or immunities.  In *Will*, the Supreme Court considered whether a state could be a "person" within the meaning of that statute.  (491 U.S. at p. 64.)  Answering that question in the negative, the Court concluded that section 1983 did not apply to "arms of the state," which it defined as those entities that would be immune from suit in federal court under the Eleventh Amendment.  (*Will*, at pp. 65–67, 70.)

Following *Will*, courts have consistently concluded that states are not "persons" subject to suit under section 1983.  (*Pitts v. County of Kern* (1998) 17 Cal.4th 340, 348 [because states and state officials are not "persons" under section 1983, they may not be sued under that statute in federal *or* state court]; *McAllister v. Los Angeles Unified School Dist.* (2013) 216 Cal.App.4th 1198, 1207 ["a state, an entity acting as an 'arm of the state,' or a state official sued in his official capacity may not be considered a 'person' who may be liable under section 1983"]; *Kirchmann v. Lake Elsinore Unified School District*

13

(2000) 83 Cal.App.4th 1098, 1100 (*Kirchmann*) [public school district could not be sued under section 1983]; cf. *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, 690 [unlike states, municipalities *are* persons that may be sued under section 1983].)  This is not because an arm of the state is *immune* from suit under the Eleventh Amendment or sovereign immunity; such an entity is simply not "as a matter of statutory construction, . . . a 'person' as that term is used in section 1983."  (*Pierce v. San Mateo County Sheriff's Dept.* (2014) 232 Cal.App.4th 995, 1006.)

Courts have extended *Will's* reasoning to claims under 42 United States Code section 1981.  (*Pittman v. Oregon*, *Employment Dept.* (9th Cir. 2007) 509 F.3d 1065, 1071–1073.)  "[W]hile Eleventh Amendment sovereign immunity does not apply in state court, the practical effect of the holding in *Will* is that actions against arms of the state under both [42 United States Code] § 1983 and § 1981 cannot be brought in either federal or state court, because the cause of action in § 1983 does not reach arms of the state." (*Id.* at p. 1072.)  Although California courts have yet to consider this issue, we follow *Pittman's* approach.

The Board is indisputably an arm of the state.  (*Jackson v. Hayakawa* (9th Cir. 1982) 682 F.2d 1344, 1350; *Stanley v. Trustees of California State University* (9th Cir. 2006) 433 F.3d 1129, 1133 [California State University "Trustees are an arm of the state that can properly lay claim to sovereign immunity"]; *Poschman v. Dumke* (1973) 31 Cal.App.3d 932, 942 ["The trustees of California State Colleges are a state agency created by the Legislature"]; *Thompson v. City of Los Angeles* (9th Cir. 1989) 885 F.2d 1439, 1443 [because the University of California at Los Angeles was an arm of the state

14

under the Eleventh Amendment, it was not a "person" subject to suit under section 1983]; see *Maryland Stadium Auth. v. Ellerbe Becket*, *Inc*., (4th Cir. 2005) 407 F.3d 255, 262 ["Numerous courts have decided whether public state universities are 'arms of the state.' Almost universally, the answer has been in the affirmative."].)  Therefore, it may not be sued under 42 United States Code sections 1981 and 1983.

To avoid this result, plaintiffs argue CSUSM's receipt of federal funds under title VI *waives* its sovereign immunity.  (See 42 U.S.C. § 2000d-7(a)(1) [no Eleventh Amendment immunity for violations of title VI].)  But as the Board points out, plaintiffs "confuse sovereign immunity with whether a statute itself creates a cause of action against a state."  "[W]hether an entity is a 'person' subject to suit under section 1983 is a matter of federal law and is not affected by whether the entity has sovereign immunity . . . "  (*Kirchmann*, *supra*, 83 Cal.App.4th at p. 1105 [rejecting argument that by enacting the California Tort Claims Act, school districts could be sued under section 1983], italics omitted.)  Title VI cannot make the Board liable under 42 United States Code section 1983 if it is not a "person" subject to liability under that statute.  (See *Kirchmann*, at p. 1105 ["California cannot, by enacting the California Tort Claims Act, make school districts liable under section 1983 if they are not 'persons' subject to section 1983 liability under federal law"].)  Accordingly, the trial court properly granted summary adjudication as to claims for harassment, discrimination, and retaliation under sections 1981 and 1983.

Because Cooper solely challenges summary adjudication as to the section 1981 claim, our conclusion here completely disposes of her appeal.  We therefore turn our attention to the appeal by the freshmen plaintiffs, Mackey, Williams, Smith, and Hicks.

15

These plaintiffs do not challenge summary adjudication on their negligent supervision claim; they instead focus on whether summary adjudication was proper as to their claims for race discrimination under title VI and the Unruh Act, and for retaliation under title VI.

2. *Freshmen Plaintiffs' Race Discrimination Claims under Title VI and the Unruh Act*

The freshmen plaintiffs challenge summary adjudication on their race discrimination claims under title VI (42 U.S.C. § 2000d et seq.) and the Unruh Act (Civ. Code, § 51 et seq.). Both statutes require a burden-shifting analytical framework in which (1) the plaintiff bears a prima facie burden to show discrimination, shifting the burden to (2) the defendant to proffer a race-neutral reason for the adverse action, which again shifts the burden to (3) the plaintiff to show the reason given is pretextual or some other evidence of discriminatory motive. But this burden-shifting framework must be adjusted at summary judgment, where the moving defendant bears the burden to show there is no triable issue of material fact. As we explain, when properly applied, defendant did not meet its burden, and summary adjudication is improper on the freshmen plaintiffs' race discrimination claims.

a. *Additional background*

The Board argued the freshmen plaintiffs could not establish a prima facie case of racial discrimination because (1) they could not show a materially adverse action impacting their ability to play basketball, and (2) they could not demonstrate that similarly situated students who were not members of their protected class were treated

16

differently. It further argued the freshmen plaintiffs could not establish that Coach

Jennum intentionally discriminated against them based on race.

The trial court largely agreed. It concluded that Mackey, Hicks, and Smith failed

to show an adverse action because they were not suspended or released from the team.

Mackey was suspended for academic reasons; Hicks remained on the team; and Smith

resigned. As to Williams, who was released, the court believed assistant coach Harris

offered a legitimate, nondiscriminatory reason that Williams had not proven to be

pretextual. In reaching this result, the court sustained most of the Board's evidentiary

objections.

On appeal, the freshmen plaintiffs challenge selected evidentiary rulings before

turning to their primary argument that the court construed the adverse action requirement

too narrowly. They contend that reduced playing time, a hostile environment, and

harsher treatment can reasonably constitute adverse action under title VI and the Unruh

Act. They also challenge whether assistant coach Harris's declaration demonstrated a

nondiscriminatory basis for Williams's release. We address each of these arguments in

turn.

b. *Evidentiary rulings*

The freshmen plaintiffs challenge three categories of evidentiary rulings. We limit

our review to these specific challenges. (See *Carnes v. Superior Court* (2005) 126

Cal.App.4th 688, 694 (*Carnes*) [on appeal from summary judgment, plaintiff must

identify evidentiary rulings claimed to be incorrect].) As we explain, the court erred in

sustaining two objections to Mackey's declaration but otherwise did not err in its evidentiary rulings.

Although a trial court does not "try" the case or weigh the evidence at summary judgment, it does consider the competency of evidence presented. (*Aguilar*, *supra*, 25 Cal.4th at p. 856; *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 525–526.) A party "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact." (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.) "The same rules of evidence that apply at trial also apply to the declarations submitted in support of and in opposition to motions for summary judgment. Declarations must show the declarant's personal knowledge and competency to testify, state facts and not just conclusions, and not include inadmissible hearsay or opinion." (*Bozzi v. Nordstrom*, *Inc.* (2010) 186 Cal.App.4th 755, 761 (*Bozzi*); see Code Civ. Proc., § 437c, subd. (d).)

"[T]he weight of authority holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard." (*Carnes*, *supra*, 126 Cal.App.4th at p. 694; cf. *Nazir v. United Airlines*, *Inc.* (2009) 178 Cal.App.4th 243, 255, fn. 4 (*Nazir*) [observing the standard of review question may be unsettled]; *Reid v. Google*, *Inc.* (2010) 50 Cal.4th 512, 535 (*Reid*) [sidestepping whether de novo review applies for evidentiary rulings made solely on the papers].) The party challenging an evidentiary ruling bears the burden of establishing the court exceeded the bounds of reason. (*DiCola v. White Bros. Performance Products*, *Inc.* (2008) 158 Cal.App.4th 666, 679.) Nevertheless, evidentiary questions at summary judgment " 'are

18

subject to the overarching principle that the proponent's submissions are scrutinized strictly, while the opponent's are viewed liberally." (*Serri*, *supra*, 226 Cal.App.4th at p. 852.)

The Board objected to the entire declarations of plaintiff Sierra Smith and Mr. and Mrs. Williams (Williams's parents) on the basis they were untimely filed. We find no error in the exclusion of these late-filed declarations. Section 437c, subdivision (b)(2) of the Code of Civil Procedure requires opposition papers to be filed and served 14 days before the hearing, unless the court orders otherwise for good cause. "A trial court has broad discretion under rule 3.1300(d) of the California Rules of Court to refuse to consider papers served and filed beyond the deadline without a prior court order finding good cause for late submission." (*Bozzi*, *supra*, 186 Cal.App.4th at p. 765.) Plaintiffs inadvertently filed the declarations of Smith and Williams's parents on February 28, 2017, four days after the Board filed its reply and three days before the hearing date. A paralegal declaration cited upload error as the reason for the late filing. Nevertheless, plaintiffs did not seek a continuance, and there was no abuse of discretion in excluding declarations filed after the reply. (*Ibid.*; *G.E. Hetrick & Associates*, *Inc. v. Summit Construction & Maintenance Co.* (1992) 11 Cal.App.4th 318, 325.)

Next, plaintiffs argue the court erred in finding that certain aspects of Mackey's and Williams's declarations contradicted their deposition testimonies. We address these three objections in turn.

First, the Board objected to Mackey's statement that she told athletic director Milo during their meeting, "I felt discriminated against by Coach Jennum" and "unfairly being

19

singled out, along with other black players based on their race." As the Board noted, Mackey did not remember at her deposition whether she used the word "discriminating" and may have said Jennum was "singling [them] out." But she later clarified that she communicated to Milo that she thought she was being treated differently because of her race. The Board did not object to Mackey's subsequent statement in her declaration that she felt upset that Milo recapped that meeting to indicate that Mackey did *not* perceive differential treatment based on race. And Jennum responded to Mackey's meeting with Milo by holding a team meeting where she stated someone had called her a racist. We agree with plaintiffs that "the circumstantial evidence indicates Mackey conveyed her belief that Jennum discriminated against Plaintiffs based on their race" during her meeting with Milo.

The Board cites *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1 (*D'Amico*) for the proposition that a plaintiff cannot defeat summary judgment by declaratory statements contradicting her deposition testimony. But the *D'Amico* rule only applies where there has been a " 'clear and unequivocal admission by the plaintiff.' " (*Id.* at p. 21.) "In a nutshell, the rule bars a party opposing summary judgment from filing a declaration that purports to impeach his or her own prior sworn testimony." (*Scalf v. D.B. Log Homes, Inc.* (2005) 128 Cal.App.4th 1510, 1522 (*Scalf*).) It does not apply where there is a "reasonable explanation for the discrepancy" or "countenance ignoring other credible evidence that contradicts or explains that party's answers or otherwise demonstrates there are genuine issues of factual dispute." (*Id.* at pp. 1524−1525.) The court thus erred in sustaining the Board's evidentiary objection No. 4.

20

Second, the Board objected to Mackey's statement that she filed a discrimination complaint the day after Jennum's "Am I racist?" team meeting. It argued this contradicted Mackey's deposition testimony that she first filed a complaint on January 30, 2014. But as plaintiffs point out, Mackey's written complaint in January was hardly her first. After the "Am I racist?" meeting, Mackey spoke to the Dean of Students and eventually had a three-way meeting with her and Jennum. When Mackey saw no improvement, she again contacted the dean. Deposition excerpts submitted on summary judgment do not reveal *when* Mackey's initial contact with the dean or the three-way meeting took place. But Williams testified that Mackey met with the dean sometime in November, not too far after the "Am I racist?" team meeting. Because Mackey's statement that she made a complaint the day after the "Am I racist?" meeting is not necessarily impeached by her deposition testimony (*Scalf*, *supra*, 128 Cal.App.4th at pp. 1524−1525), the court erred in sustaining the Board's evidentiary objection No. 7.

Third, the Board objected to Williams's statement that "[a]s a redshirt, I did not realize that I would not be allowed to travel with the team for games." This presents a closer call. At deposition, Williams testified that when she was offered a "red shirt" position, she did not know if she would travel. She believed that she would practice with the team but not compete in games. During weekly one-on-one meetings with the coaches, Williams would ask whether she would be traveling. She was "pretty sure" but not "completely sure" that she would not be. She later explained that red shirts on other teams did travel, but Jennum had told her the basketball team "didn't 'travel big.' " As we read the record, Williams expressed uncertainty but a general understanding that she

21

would not be traveling with the team. Although her testimony arguably is not a clear and unequivocal admission precluding her declaratory statement (*D'Amico*, *supra*, 11 Cal.3d at p. 21), we cannot say the court abused its discretion in sustaining the Board's evidentiary objection No. 13.

Apart from these specific claims, plaintiffs challenge the exclusion of certain statements in the declarations of Mackey and Williams that were corroborated by McLean's investigative report. The Board objected on hearsay and foundation grounds to Mackey's statements that after her suspension, Jennum held a team meeting where she asked players if Mackey should remain on the team. (Evid. Code, §§ 702, subd. (a), 1200, subd. (b).) It raised these same objections to Williams's statement that she learned from teammates that Jennum released her for being disrespectful, not for her playing abilities.

Plaintiffs argue both statements were included in McLean's report, rendering them "party admissions."[8] The Board disagrees, arguing McLean's report is hearsay and quotes within it are double hearsay. The Board is correct. "Documents like reports, criminal records, hospital records, and memoranda—prepared outside the courtroom and offered for the truth of the information they contain—are usually themselves hearsay and may contain multiple levels of hearsay, each of which is inadmissible unless covered by an exception." (*People v. Yates* (2018) 25 Cal.App.5th 474, 482.) McLean authenticated

---

[8]    Hicks testified at her deposition that Jennum made her comments about Mackey as Mackey was getting her backpack out of the room. But plaintiffs do not cite this evidence to contend Mackey overheard Jennum's comments.

her investigative report and could competently testify as to her *findings*. That does not render hearsay statements included within her report admissible as *party admissions*. Moreover, *Mackey* and *Williams* could not base their declaratory statements on hearsay or conclusions drawn by *McLean* without "competent averments made by one having personal knowledge of the facts." (*Donnachie v. East Bay Regional Park Dist.* (1963) 217 Cal.App.2d 172, 175.)

Plaintiffs suggest the challenged statements in Mackey and Williams's declarations were offered to show the effect on the listener—i.e., how a reasonable person belonging to a protected group would view Jennum's statements. (See *People v. Scalzi* (1981) 126 Cal.App.3d 901, 907.) But to the extent the challenged statements have any relevance, it is for their truth, to show that Jennum was trying to remove Mackey and Williams from the team for different reasons than the Board now claims. The court did not abuse its discretion in sustaining the Board's evidentiary objection Nos. 8, 9, 10, 17, and 18.

c.      *Overview of title VI and the Unruh Act*

Title VI prohibits intentional discrimination in federally funded programs. "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." (42 U.S.C. § 2000d.) CSUSM's college athletics qualify as a federally funded "program or activity." (*Id.*, § 2000d–4a.) There is an implied private right of action to enforce title VI's core prohibition against racial discrimination in federally funded program, to the

23

extent the claims rest on intentional discrimination, not disparate impact. (*Alexander v. Sandoval* (2001) 532 U.S. 275, 280.)

California's Unruh Act creates a cause of action for any person who is denied the right to "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever" based on that person's "sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status." (Civ. Code, §§ 51, subd. (b), 52.) The Unruh Act requires proof of *intentional* acts of race discrimination and does not cover disparate *impact*. (*Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 854, citing *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1175; cf. *Munson v. Del Taco*, *Inc.* (2009) 46 Cal.4th 661, 670 [disparate impact is available for *disability* discrimination].)

Race discrimination claims under title VI and the Unruh Act follow the analytical framework established under federal employment law. (See *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802; *Guz v. Bechtel National*, *Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*) [California has adopted the *McDonnell Douglas* burden-shifting framework for discrimination claims alleging disparate treatment]; *Rashdan v. Geissberger* (9th Cir. 2014) 764 F.3d 1179, 1182 [title VI]; *Trigueros v. Southwest Airlines* (S.D.Cal., Aug. 30, 2007, No. 05-CV-2256-L(AJB)) 2007 U.S.Dist. Lexis 64234, p. *4 [Unruh Act].) Although coaches are different from "ordinary employers," the *McDonnell Douglas* framework strikes the appropriate balance in evaluating race discrimination claims brought by college athletes:

"[I]t is not appropriate to allow college coaches to impose their own racial prejudices on college athletes. The familiar employment-discrimination framework, designed to account for the competing concerns of employer discretion and equal protection, strikes an appropriate balance. It gives the coach an opportunity to make legitimate personnel decisions without facing liability, while protecting student-athletes from race-based discrimination. In this analysis, it may be appropriate to give coaches somewhat more deference than ordinary employers. But any such leeway comes from the broad range of legitimate, nondiscriminatory reasons a coach may have for deciding who plays, how much they play, and whether they stay on the team from year to year, not any special per-se rule applicable to college coaches." (*Heike v. Guevera* (6th Cir. 2013) 519 Fed.Appx. 911, 918 (*Heike*).)

Under the *McDonnell Douglas* framework, a plaintiff bears the initial burden to establish a prima facie case of race-based discrimination. "The specific elements of a prima facie case may vary depending on the particular facts," but a plaintiff must generally show that "(1) [she] was a member of a protected class, (2) [she] was qualified for the position [she] sought or was performing competently in the position [she] held, (3) [she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz*, *supra*, 24 Cal.4th at p. 355.) That prima facie showing gives rise to a rebuttable presumption of discrimination, shifting the burden on the employer to produce admissible evidence that its action was taken for a legitimate, nondiscriminatory reason. If the employer makes that showing, the plaintiff again bears the burden to show that the reasons given were a pretext for discrimination or offer some other evidence of a discriminatory motive. (*Id.* at pp. 355–356.)

25

But any burden-shifting framework must account for the procedural posture of the case. The summary judgment statute places the burden on a moving defendant to show that "one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) Only if a defendant meets that burden does the burden shift to plaintiffs to show the existence of a triable issue of material fact. (*Ibid.*) As the party seeking summary judgment, the *Board* " 'has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse . . . action was based upon legitimate, nondiscriminatory factors.' " (*Serri*, *supra*, 226 Cal.App.4th at p. 861, citing *Hicks v. KNTV Television, Inc.* (2008) 160 Cal.App.4th 994, 1003; see *Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 216 [although the burden of proof ultimately rests with the plaintiff *at trial*, " 'the burden is reversed in the case of a summary issue adjudication or summary judgment motion' "]; *Abed v. Western Dental Services, Inc.* (2018) 23 Cal.App.5th 726, 737 (*Abed*) [*McDonnell Douglas* does not alter the procedural rule that the moving party bears the initial burden on summary judgment]; *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 926 [same].)

The trial court overlooked this principle in concluding that Mackey, Smith, and Hicks had not met *their* prima facie burden to show race discrimination.[9] Applying the correct standard on de novo review, we consider whether the Board met *its* burden to show that the freshmen plaintiffs *could not* establish a prima facie case, or that there were legitimate, nondiscriminatory reasons for the adverse actions alleged.

d. *Freshmen plaintiffs' prima facie case*

The Board argues that the freshmen plaintiffs cannot establish a prima facie case of race discrimination because they cannot show they suffered a materially adverse action, or that similarly situated students who were not members of their protected class were treated differently. As to Mackey and Williams, the Board further argues they were not qualified to play.[10] Viewing the evidence in the light most favorable to the freshmen plaintiffs, we conclude the Board did not meet its moving burden to show there is no

---

[9]     The trial court was not alone in this regard. The limited federal cases we have found addressing title VI in the athletics context do not appear to modify the *McDonnell Douglas* framework to summary judgment. (See *Heike*, *supra*, 519 Fed.Appx. at pp. 919–920 [plaintiff "does not carry her burden to establish a *prima facie* case of discrimination"]; *Elliott v. Delaware State University* (D.Del. 2012) 879 F.Supp.2d 438, 443 (*Elliott*) ["To avoid summary judgment, [plaintiff] must make a prima facie case of discrimination . . . ."].) Although we rely on other portions of these cases, we do not follow their approach as to the applicable burdens of proof.

[10]     Plaintiffs argue this element of plaintiffs' prima facie case went uncontested, meaning the parties did not develop an evidentiary record on that point. (See, e.g., *Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 341 ["we must assume the role of the trial court"]; *Torres v. Reardon* (1992) 3 Cal.App.4th 831, 836 [appellate review "is limited to the facts contained in the documents presented to the trial court"].) As we view it, the argument was raised, but solely as to Mackey and Williams. The Board argued that Mackey was suspended for academic reasons, which left her ineligible to play, and that Williams was a red shirt who was ineligible for playing time during games.

triable issue of material fact as to whether each suffered an adverse action under circumstances that suggest a racially discriminatory motive. (See *Aguilar*, *supra*, 25 Cal.4th at p. 850; *Light*, *supra*, 14 Cal.App.5th at p. 92.)

### 1. Adverse Action

The trial court concluded that nothing short of release from the team could constitute an adverse action for purposes of establishing a prima facie case of race discrimination. As we explain, the court construed the adverse action requirement too narrowly. On our record, the Board did not meet its moving burden to show that the freshmen plaintiffs could not establish a materially adverse action.

### A. Defining an "adverse action" in collegiate sports

In the employment discrimination context, an "adverse action" is one that "materially affects the terms, conditions, or privileges of employment" based on the "totality of the circumstances." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1036, 1051 (*Yanowitz*).) It goes beyond "so-called 'ultimate employment actions' such as termination or demotion' " to cover "the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." (*Id.* at pp. 1053–1054.) "[T]he determination of what type of adverse treatment properly should be considered discrimination in the terms, conditions, or privileges of employment is not, by its nature, susceptible to a mathematically precise test, and the significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and the employee." (*Id.* at p. 1054.)

28

"[A] mere offensive utterance or even a pattern of social slights by either the employer or coemployees *cannot* properly be viewed as materially affecting the terms, conditions, or privileges of employment." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1054, italics added.) "Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and *are not actionable . . . .*" (*Ibid.*, italics added.)

At the same time, "there is no requirement that discriminatory acts "constituted one swift blow, rather than a series of subtle, yet damaging, injuries." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1055.) "[A]dverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions . . . ." (*Id.* at pp. 1054−1055; see e.g., *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359 [police lieutenant was removed from chain of command, then removed from law enforcement duties, then transferred to job for which he lacked training]; *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1445, 1457 [employer eliminated or reduced promotional opportunities]; *Light*, *supra*, 14 Cal.App.5th at p. 93 ["the reduction of Light's hours [to zero] alone could constitute a material and adverse employment action"].)

This is not an employment discrimination case, but rather one alleging discrimination in college athletics. In this context, "a plaintiff must present facts showing

29

that she was deprived of access to educational benefits in a significant way." (*Elliott*, *supra*, 879 F.Supp.2d at p. 445.) Applying internal CSUSM policies, investigator Lisa McLean defined an "adverse action" as "an action that has a substantial or material adverse effect on the Complainant's ability to participate in a University program or activity free from Discrimination, Harassment, or Retaliation."[11] (See, e.g., *Fulton v. Western Brown Local School District Board* (S.D. Ohio, Nov. 23, 2016, No. 1:15-cv-53), 2016 U.S.Dist. Lexis 162510, p. *18 [harassment from his peers and racially charged statements by teachers deprived an African-American student " 'of a supportive, scholastic environment free of racism and harassment' "].)[12]

These formulations square with *Yanowitz*, and we adopt them here. Although minor or trivial actions that merely upset a college athlete are not actionable, we look to the totality of circumstances to consider whether the freshmen plaintiffs can establish that they were deprived the terms, conditions, or privileges of participation on their college

---

[11]    CSUSM policies, in turn, defined harassment as " 'unwelcome conduct engaged in because of a Protected Status that is sufficiently severe, persistent or pervasive that its effect, whether or not intended, could be considered by a reasonable person in the shoes of the Student, and is in fact considered by the Student, as limiting the student's ability to participate in or benefit from services, activities, or opportunities offered by the University.' "

[12]    Although it involved a different procedural posture, college football players in *Boyd v. Feather River Community College District* likewise claimed race discrimination under Title VI based in part on "the verbal abuse and discrimination directed at African American football players." ((E.D.Cal. Oct. 20, 2011, No. 2:11-CV-0231 JAM-EFB) 2011 U.S. Dist. Lexis 121683, at p. *9.) The trial court denied the motion to dismiss, concluding the complaint "sufficiently alleged race discrimination in violation of Title VI." (*Ibid.*)

team, including by being denied the opportunity to participate in an environment free from discrimination, harassment, or retaliation.

## B. Trial court's narrow interpretation

The trial court found that experiences such as limited playing time and harsher punishment could not constitute a materially adverse action for purposes of a prima facie case of racial discrimination. Instead of such experiences, the court focused on whether Mackey, Smith, Hicks, and Williams were suspended or released from the team. Of these four, it found that only Williams had arguably suffered an adverse action—Mackey was suspended for academic reasons, Smith resigned, and Hicks remained on the team.

As *Yanowitz* and *Elliott* demonstrate, the trial court construed the adverse action requirement too narrowly. Actions short of dismissal from a team could, under the right circumstances, materially affect the terms, conditions, or privileges of a student athlete's participation in college athletics. For example, in *Elliott,* a White college volleyball player (Elliott) sued her university, claiming her coach (Arnold) engaged in racial discrimination, created a racially hostile environment, and retaliated against her in violation of title VI. (*Elliott*, *supra*, 879 F.Supp.2d at p. 440.) As to the adverse action element, Elliott alleged her coach had singled her out for harsher treatment,

> "including forcing the entire team to run only when Elliott made mistakes, excluding Elliott from team text messages, attempting to revoke Elliott's scholarship, refusing to allow Elliott to travel with the team, refusing to play Elliott in virtually every volleyball game, repeatedly denouncing Elliott in front of the team, forcing Elliott to undergo drug testing, removing Elliott's name from the web-site and team roster, and forcing Elliott to play through painful shin splints." (*Id.* at p. 445.)

31

These actions were sufficient to defeat summary judgment on the retaliation claim. "Viewed in the light most favorable to Elliott," the evidence showed coach Arnold went to "considerable lengths" to engage in "openly hostile treatment" once she complained about racial discrimination. (*Id.* at p. 449.) As the court reasoned, these facts could support a theory of constructive discharge—i.e., that her coach's treatment surpassed a threshold of intolerable conditions, making her continued participation on the team impossible. (*Id.* at pp. 448–449.)

Coaches have broad discretion to decide "who plays, how much they play, and whether they stay on the team from year to year," but they may not make coaching decisions for racially discriminatory reasons. (*Heike*, *supra*, 519 Fed.Appx. at p. 918.) The difficulty lies in deciding where to draw the line and avoid subjecting run-of-the-mill coaching decisions to unwarranted judicial oversight. (*Id.* at p. 922.) Although some set of factors short of release from a team may constitute an adverse action, a case does not proceed to a jury merely because the factors combined negatively impact a college athlete's experience on the team. Coaches yell at players and impose discipline in an effort to motivate; nearly every player believes she deserves more playing time. To further complicate the inquiry, the degree of certainty as to whether a coach's action is motivated by racial animus may bear on whether such action is materially adverse.

Although we believe the trial court drew the line too narrowly, we need not define precisely where the line lies in every case. As we explain, we evaluate the totality of circumstances and conclude on our facts that each freshman plaintiff has raised a triable issue on the adverse action element. (See *Yanowitz*, *supra*, 36 Cal.4th at pp. 1055−1056

[there is no need to decide whether something short of the totality of actions alleged would suffice].)

           C.      The Board did not meet its moving burden to show that the freshmen plaintiffs could not establish a materially adverse action

The freshmen plaintiffs alleged they received fewer opportunities and harsher treatment than their non-African-American peers. Jennum split them up when they stood together, yelled at them more frequently (singling them out as "the group"), pulled them out of practice, and limited their playing time. At the fall retreat, Jennum forced Mackey (but not other injured players) to join the four-mile team run and did not let Smith change into proper running shoes. The freshmen plaintiffs felt singled out and perceived having less leeway for the same mistakes than their non-African-American peers, making it harder for them to improve. Meanwhile, three non-African-American freshmen received significant playing time from the start and were not necessarily better players.

Smith could not understand why she, Mackey, and Hicks "were barely getting any opportunities to just even show or make mistakes" compared to their non-African-American freshmen teammates. She also complained that Jennum canceled her last five weekly one-on-one meetings. Jennum did not even allow Williams to practice, and eventually she was just standing around for two hours each practice session. At some point during the semester, Jennum barred Mackey, Smith, and Hicks from attending a two-game tournament in Redding.[13]

---

[13]    As a red shirt, Williams was not eligible to travel to Redding or play in games.

33

Although her claims are time barred, Cooper shared a similar perspective:  Jennum limited her playing time, did not start her frequently, yelled at her, blamed her for losing games, and separated her from her teammates as a "bad influence."  She too perceived this treatment as race-based given how Jennum treated the only two African-American players then on the team.  (See *Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 759 ["me too" declarations by nonplaintiff former employees were admissible in employment discrimination case].)

Smith and Williams tried but could not pinpoint any reason other than race to explain why only certain players were being singled out.  Mackey voiced concern to the athletic director and eventually the Dean of Students.  Both she and Williams ultimately filed formal complaints of race discrimination, harassment, and retaliation.  Significantly, after investigating those complaints Lisa McLean found sufficient evidence that Jennum had engaged in *race-based harassment* as to Mackey and Williams, citing the "Am I racist?" team meeting that all four freshmen plaintiffs attended.[14]  In the face of this conclusion reached by a university investigator, CSUSM proffered no evidence from *Jennum* to explain why the alleged harsher treatment was grounded in ordinary coaching decisions, not race.

Had all four freshmen plaintiffs remained on the team, we might struggle to determine whether, on balance, the evidence was sufficient to raise a triable issue of an adverse action.  While " '[w]orkplace harassment, if sufficiently severe or pervasive, may

---

[14]    Although a *Skelly* officer reversed that finding, that alone does not negate the existence of a triable issue.  (See fn. 7, *ante*.)

in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case' " (*Yanowitz*, *supra*, 36 Cal.4th at p. 1056, fn. 16), "the impact of an employer's action in a particular case must be evaluated in context" and account for "the unique circumstances of the affected employee as well as the workplace context of the claim" (*id.* at p. 1052).  It is thus unclear whether athletes who simply perceive differential treatment, harsher discipline and/or less playing time on the basis of race can reasonably show a materially adverse impact in the college athletics context.  While the totality of such experiences in a given case might deprive a student-athlete of "access to educational benefits in a significant way" (*Elliott*, *supra*, 879 F.Supp.2d at p. 445), freely imposing liability on such a basis might invite unwarranted judicial oversight of run-of-the-mill coaching decisions every time a student feels slighted based on race.

Here we need not decide that difficult question.  As we explain, three of the four freshmen plaintiffs actually left the team, each attributing her departure in one way or another to Jennum's allegedly discriminatory treatment.  Although the fourth did not leave, a reasonable trier of fact could nevertheless conclude she suffered a materially adverse action; the departures of her peers suggests a sufficient severity or pervasiveness of Jennum's treatment to withstand summary judgment.  Therefore, a reasonable jury could find that each freshman plaintiff suffered a materially adverse action.

Williams was actually cut from the team.  As the semester progressed, she was getting fewer and fewer opportunities to improve; Jennum complained about even her dribbling on the sidelines.  In late December, she enjoyed a rare chance to join practice

35

and was told she had made good progress.  Nevertheless, Jennum released her the next day, allegedly for not playing at the collegiate level.  The Board does not challenge the trial court's finding that Williams's release, standing alone, reasonably constituted an adverse action.  We reach that same conclusion based on Williams's release *combined with* the totality of her experiences with Jennum as a red shirt on the team.  In short, the Board did not meet its moving burden to prove that no reasonable jury could find that Williams suffered a materially adverse action.

The same could reasonably be said of Mackey and Smith, even though neither was released in the same manner as Williams.  Mackey fell behind in her coursework and started seeing a therapist to cope with Jennum's treatment.  When she fell a credit short, she became academically ineligible to play.  She believed she "probably could've passed if [she] didn't go through all this stuff."  The university's title IX[15] coordinator agreed with this assessment, writing to the NAIA president in October 2014 that Jennum's treatment "impacted [Mackey's] ability to participate to her level of ability in athletics" and impaired her academic performance, affecting "the number of credits she successfully completed during the 2013–2014 academic year."  Although Mackey caught

---

[15]    "Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.) ([t]itle IX), applicable to universities receiving any federal financial assistance, requires institutions of higher education to address discrimination on the basis of sex." (*Doe v. University of Southern California* (2018) 29 Cal.App.5th 1212, 1215, fn. 2.)  At all relevant times, CSUSM had a designated title IX coordinator who also served as the university's discrimination, harassment, and retaliation administrator.  We refer to this person throughout this opinion as the "title IX coordinator."

up over winter break, she felt it was not "safe" to rejoin the team until after Jennum left the university, in the spring.[16]

Smith likewise testified that she "felt like [she] had no other option but to quit and remove [herself] from the situation because it was just causing too much stress and depression."[17] She struggled to make the "very hard decision" to resign; "basketball was [her] life and [her] love, and [she] didn't want to give it up." But no matter what effort she gave, Smith felt "constantly being yelled at and put down and corrected for" while other players making the same mistakes were not getting corrected. Complaining as Mackey had done only seemed to make Jennum's treatment worse.

To establish at trial that they were effectively forced off the team, Smith and Mackey would need to show that Jennum's discriminatory treatment made their continued participation on the team intolerable. (*Elliot*, *supra*, 879 F.Supp.2d at p. 448.) "The

---

[16] McLean did not find an adverse action as to Mackey, concluding her release was precipitated by academic ineligibility, not Jennum's conduct. McLean made her findings under a preponderance of the evidence standard and did not consider whether Mackey's academic ineligibility was intertwined with Jennum's treatment. We reach a different conclusion on summary judgment. "It remains for the trier of fact to decide whether [Mackey's] allegations are true." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1061.) We likewise reject the Board's contention that Mackey and Williams could not show they were qualified to play; their lack of qualifications could reasonably be viewed as intertwined with Jennum's discriminatory treatment. Mackey was academically suspended, she alleged, after emotional stress led her to fall a credit behind. Likewise, a jury could reasonably determine that Jennum stymied Williams's opportunities to improve as a red shirt and become a collegiate basketball player.

[17] We reject the Board's claim that Smith "now claims, *for the first time on appeal*, that she resigned due to Coach Jennum's 'discriminatory treatment.' " Smith's testimony on this point is among the materials submitted in opposition to the Board's motion for summary judgment.

proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Turner v. Anheuser-Busch*, *Inc.* (1994) 7 Cal.4th 1238, 1246.)  On summary judgment, however, we must view the evidence in the light most favorable to Smith and Mackey.  (*Light*, *supra*, 14 Cal.App.5th at p. 92.)  We cannot say that Jennum's treatment, assuming it was racially motivated, could not be deemed objectively intolerable so as to deprive these plaintiffs of the terms, conditions, or privileges of playing on their college team.  (*Elliott*, at p. 449.)  Accordingly, the Board did not establish that no reasonable jury could find that Mackey and Smith suffered a materially adverse action.

It is true that Hicks remained on the team, so she could not individually argue that she was effectively compelled to leave the team.  Yet she reported similar adverse treatment by Jennum.  And in assessing whether there was enough evidence that Jennum's negative treatment of the freshman plaintiffs was sufficiently severe and pervasive to constitute an "adverse action," we cannot ignore the fact that these are not isolated complaints by solitary individuals.  There were, at most, six African-Americans

on the 2013–2014 roster.[18]  All or nearly all (potentially including Melaya Gaines)

perceived that Jennum discriminated against them based on their race.[19]  Within months

of the season starting, Williams was terminated; Mackey and Gaines lost eligibility; and

Smith resigned, leaving only Hicks on the roster.

The departure of Smith, in particular—the only other African-American freshman

not compelled to leave the team—could support an inference that a reasonable person in

Hicks's shoes would have found such treatment objectively intolerable.  We acknowledge

that Hicks "was more the quiet one" and although she had "[her] little incidents that

happened with [Jennum] . . . it wasn't as much as the other players."[20]  But Smith

ultimately concluded that she had no choice but to leave the team.  Recognizing that

---

[18]     Although we do not have the roster, the record suggests there were 16 members of
the 2013–2014 team including Williams (the only red shirt).  Of these, nine were
freshmen.  Five of the nine freshmen were African-American—the four freshmen
plaintiffs plus Melaya Gaines.  There was conflicting evidence as to whether Sherika
Miller, the team captain, was also African-American.  Mackey believed she was; Hicks
thought she was mixed-race; Smith thought she was Asian; and Cooper believed she was
"black and Japanese."  To the extent the Board sought to rely on Miller's race to disprove
discriminatory intent—e.g., by suggesting she was elevated to team captain, was not
lumped with "the group" at the breast cancer walk, etc.—it bore the burden to establish
the factual predicate that Miller shared the same race as the freshmen plaintiffs.  On this
record, the evidence is inconclusive.

[19]     For example, there was no objection to Hicks's declaratory statement that she
witnessed Jennum "treat[] the black students differently," act "particularly harsh with
Kianna Williams and Lynette Mackey, in addition to another black student, Melaya
Gaines," and ignore and separate African-American students.

[20]     The Board did not argue below or on appeal that this testimony undermines
Hicks's discrimination claim.  Although Hicks may have faced comparatively less
adversity than her peers, we have no way to gauge how much less.  On this record, we
cannot say no reasonable jury could find that the level of adversity she faced materially
affected the terms, conditions, or privileges of participating on the team.

discrimination claims are inherently fact specific, the Board did not meet its burden to prove that *no* reasonable jury could find that Hicks suffered a materially adverse action notwithstanding her continued tenure on the team. (See e.g., *Light*, *supra*, 14 Cal.App.5th at p. 93 [employee's continued employment and subsequent pay raises "do not mean [her] employment was not materially and adversely affected by the [employer's] earlier actions"].)

We stress that our decision is a limited one. Viewing the record in the light most favorable to the freshmen plaintiffs, the Board did not meet its moving burden of proving that these players could not demonstrate a materially adverse action. "We emphasize that we do not determine that the alleged adverse action occurred or that it was not justified by bona fide [coaching] concerns . . . that might yet be proved at trial. We hold only that, at the summary adjudication stage, [the freshmen plaintiffs'] evidence was sufficient to satisfy the adverse action element of [their] prima facie case. It remains for the trier of fact to decide whether [the freshmen plaintiffs'] allegations are true." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1061.)

### 2.    Discriminatory Motive

The Board argues the freshmen plaintiffs cannot establish a prima facie case absent evidence that similarly situated players outside their protected class were treated differently. Evidence that Jennum treated non-African-American players differently may be probative of her discriminatory bias or intent. (See *Guz*, *supra*, 24 Cal.4th at p. 366.) But recalling the burdens on summary judgment, the proper inquiry is whether *the Board*

40

met its moving burden to show that *no reasonable jury* could find Jennum acted with discriminatory intent. On our record, we believe it did not.

In *Elliott*, a White volleyball player alleged race discrimination under title VI based on treatment like that asserted here. Despite the adverse action, the court rejected Elliott's claim because it found no evidence "suggesting that this mistreatment was rooted in race discrimination." (*Elliott*, *supra*, 879 F.Supp.2d at p. 445.) Absent evidence that the coach "favored black players over Elliott specifically and the other white players generally, or some other suggestion that [the coach's] animus toward Elliott was racially based, Elliott [did] not make a prima facie case of racial discrimination." (*Ibid.*)[21] A similar result was reached in *Heike*—even if the White college basketball player showed that her coach "was inclined to discriminate against White players, she could not demonstrate that others who were similarly situated, but members of a different race, were treated more favorably than she was." (519 Fed. Appx. at p. 920.)

Our record is different. Jennum repeatedly used the term "the group," usually with a negative connotation, to refer to all five African-American freshmen members of CSUSM's 2013–2014 basketball team—the four freshmen plaintiffs plus Melaya Gaines. (See *Reid*, *supra*, 50 Cal.4th at p. 539 [stray remarks "may be relevant, circumstantial evidence of discrimination"]; *id.* at p. 541 ["Although stray remarks may not have strong probative value when viewed in isolation, they may corroborate direct evidence of

---

21     As discussed, we believe the proper inquiry on summary judgment, at least in California, is whether the moving defendant has shown the plaintiff could *not* establish a prima facie case, or has offered a legitimate, nondiscriminatory reason for the challenged action.

discrimination or gain significance in conjunction with other circumstantial evidence."].) Other players on the team did not have nicknames. Williams and Smith could not find any other factor than their shared race to explain why members of "the group" were generally treated more harshly and receiving fewer opportunities. And McLean concluded that Jennum engaged in race-based harassment toward Mackey and Williams based on the "Am I racist?" meeting attended by all four plaintiffs.

Significantly, all four African-American freshmen plaintiffs felt the same way. Cooper, whose claims are time-barred, makes five. Each one of these women's stories bolsters the others and supports a finding of discriminatory motive, even if contrary inferences could be drawn. (*Johnson*, *supra*, 173 Cal.App.4th at p. 759 (*Johnson*) ["me too" declarations by nonplaintiff former employees were "sufficient to raise a triable issue of material fact as to why defendant fired plaintiff"].)

We readily distinguish this case from *Heike*, where the court granted summary adjudication on a White basketball player's race discrimination claim because it found no evidence a *similarly situated* player who was not White was treated better than the plaintiff. (*Heike*, *supra*, 519 Fed.Appx. at pp. 920–921.) Although Mackey, Smith, and Hicks were freshmen, they proffered evidence that non-African-American freshman at the same skill level received significant playing time. Similarly, although she was hard on the whole team, Smith testified that Jennum reserved *harsher* treatment for the African-American players. The Board responds that these assertions of differential treatment are "vague" and "conclusory," but it made no such objection before the trial court.

42

In its moving papers, the Board provided evidence that the few freshmen who received playing time filled gaps on the team—i.e., these players were not slotted behind talented juniors or seniors like Mackey was. Plaintiffs conceded that Gaines was among the freshmen who did receive playing time during games. But this evidence merely creates a triable issue as to whether there was a discriminatory motive for plaintiffs' adverse treatment. A reasonable jury might side with the freshmen plaintiffs that the non-African-American freshmen who received more playing time were no differently situated, or side with the Board that they were.[22] Likewise, a reasonable jury could rely on Gaines getting playing time to reject a prima facie case of discrimination—or credit Gaines's membership in "the group" and harsher treatment by Jennum in other areas to find discriminatory intent notwithstanding her playing time.[23] The same applies for assistant coach Harris's statement that Hicks received more playing time than a non-African-American freshman guard.[24] A jury might believe this negates a discriminatory motive or find the fact marginally relevant absent more information suggesting the two

[22]    We do not decide whether the result would differ if a single plaintiff merely alleged that she received reduced playing time. In the employment context, "an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact." (*Bradley v. Harcourt, Brace & Co.* (9th Cir. 1996) 104 F.3d 267, 270 (*Bradley*).)

[23]    Hicks witnessed Jennum treating Gaines harshly, citing one occasion where she was kicked out of practice and saying Jennum could be seen "picking on Lynette Mackey (black) or Melaya (black) some days." She testified that Jennum frequently yelled at Gaines and separated her from her fellow African-American teammates.

[24]    Harris asserted, "Hicks had more playing time during the 2013–2014 season than another freshman guard who was not African-American," without providing any information indicating the two players had similar abilities.

players were similarly skilled.  (See *Hawn v. Exec. Jet Mgmt, Inc.* (9th Cir. 2010) 615 F.3d 1151, 1157 ["whether employees are similarly situated—*i.e.*, whether they are 'similar in all *material* respects,' [citation]—is a fact-intensive inquiry, and what facts are material will vary depending on the case"].)

Like most claims of race discrimination, the inquiry here involves contested facts from which competing inferences could be drawn.  These kinds of claims are rarely suited for summary adjudication.  On our record, the Board has not shown that *no* reasonable jury could find the totality of alleged adverse treatment to be rooted in a discriminatory motive.  Certainly, we are not suggesting a triable issue exists "every time a college sports coach treats an athlete of a different race unfairly."  (*Elliott*, *supra*, 879 F.Supp.2d at p. 446.)  Nor are we concluding that Jennum in fact harbored discriminatory animus.  But unlike in *Elliot*, there *is* evidence from which a reasonable jury could find that Jennum favored non-African-American players over African-American players generally, and the freshmen plaintiffs specifically.  (*Ibid.*)  The record demonstrates a triable issue as to whether similarly situated non-African-American players were treated better.

At the motion hearing, the Board argued that run-of-the mill coaching decisions should not be subject to judicial oversight.  Otherwise, "every brand-new freshman player coming into a collegiate team thinks that they are an amazing player and deserve all the . . . playing time, not respecting the fact that there are juniors and seniors on the team that have been there longer."  That may be the case where there is *no* evidence presented

suggesting intentional discrimination. But that is not, contrary to the Board's argument before the trial court, "this case."

e. *Any nondiscriminatory reasons offered by the Board would not eliminate a triable issue*

As the party moving for summary judgment, the Board could either demonstrate that plaintiffs could not prove a prima facie case of race discrimination, *or* provide legitimate, nondiscriminatory reasons for any adverse action alleged. The Board urges us in the alternative to uphold summary adjudication based on its nondiscriminatory reasons. Assuming such reasons were provided, we conclude the freshmen plaintiffs nevertheless met their burden to show a triable issue on their race discrimination claims. (*Light*, *supra*, 14 Cal.App.5th at pp. 94−95.)

At the outset, the Board focuses solely on the freshmen plaintiffs' membership status on the team. It does not attempt to identify nondiscriminatory reasons for the various actions, conditions and circumstances that arguably made further participation on the team intolerable and thus create, in their totality, a triable issue on the adverse action requirement. (See *ante*, section d.1.C.).)

But even if such evidence had been offered, it would merely shift the burden to Mackey (and the other freshmen plaintiffs) to show that these claimed reasons were pretextual, or that "the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus." (*Light*, *supra*, 14 Cal.App.5th at p. 94; *Guz*, *supra*, 24 Cal.4th at p. 358 ["the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*"].) The freshmen

45

plaintiffs did just that. Mackey claimed she had been medically cleared by several doctors and flatly disagreed that she favored one knee given her performance during drills and positive remarks by the assistant coach and athletic director. Smith disputed that the freshmen who played were any better than those who did not. And other evidence, such as references to "the group," the "Am I racist?" meeting, and McLean's finding of race-based harassment provide other circumstantial evidence of discriminatory intent or animus notwithstanding any race-neutral reasons the Board might have proffered for Jennum giving only certain freshmen playing time or meting out harsher treatment toward others.

The Board contends Jennum could not have intentionally discriminated against the freshmen plaintiffs when she recruited them and helped them secure admission and scholarships. It cites a principle articulated in *Bradley*, *supra*, 104 F.3d at pages 270 to 271: "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." But an inference is just that; it can be rebutted. (See generally *Husman v. Toyota Motor Corp.* (2017) 12 Cal.App.5th 1168, 1189 [" 'reliance on the same-actor inference to carry the moving party over the hurdle of summary judgment is legally impermissible, because drawing legitimate inferences from the facts are jury functions and, at summary judgment, the court must disregard all evidence favorable to the moving party that the jury is not required to believe' "]; *Nazir*, *supra*, 178 Cal.App.4th at p. 273 ["Clearly, same actor evidence will often generate an inference of nondiscrimination. But the effect should not be an a priori

46

determination, divorced from factual context. Nor should such evidence be placed it in a special category, or have some undue importance attached to it, for that could threaten to undermine the right to a jury trial by improperly easing the burden on employers in summary judgment" (fn. omitted).].) Whereas the plaintiff in *Bradley* "produced no meaningful evidence indicating . . . that her supervisor harbored discriminatory animus towards her because she was a woman" (*Bradley*, at p. 270), the freshmen plaintiffs proffered enough circumstantial evidence to create a triable issue whether the reasons for their alleged differential treatment were based on their race.

Moreover, as noted, there remains a triable issue as to whether Jennum's treatment led three of four freshmen plaintiffs to leave. Although Mackey was suspended for academic reasons, a reasonable jury could find her academic decline was intertwined with the same stress that led her to seek therapy. (*Guz*, *supra*, 24 Cal.4th at p. 358 ["Invocation of a right to downsize does not resolve whether the employer had a discriminatory motive for cutting back its work force, or engaged in intentional discrimination when deciding which individual workers to retain and release. Where these are issues, the employer's explanation must address them."].) Although Smith's exit paperwork stated that she wanted to focus on her studies, she testified that she left the team rather than deal with Jennum's discriminatory treatment. (See *Elliott*, *supra*, 879 F.Supp.2d at p. 449 [denying summary adjudication on retaliation claim, where coach's hostile treatment was alleged to have made plaintiff quit the volleyball team].) Likewise, a reasonable jury could find that Jennum deprived Williams the chance to develop *as* a red shirt into a full-fledged member of the team.

The Board relies on assistant coach Harris's statement that Williams was released for performance reasons. But this merely shifted the burden back to Williams, who met it by endeavoring to show the stated reason was false. Williams was surprised by "the explanation that [she] was not good enough to play . . . because just a day before, both coaches had commended [her] on how well [she] was going and indicated that [she] was making good progress." Mackey recalled the same thing—at practice, Jennum "in front of everyone, said that Kianna was getting much better and . . . knows our plays." " '[E]vidence that the employer's claimed reason [for the employee's termination] is *false*—such as that it conflicts with other evidence, or appears to have been contrived after the fact—will tend to suggest that the employer seeks to conceal the real reason for its actions, and this in turn may support an inference that the real reason was unlawful." (*Serri*, *supra*, 226 Cal.App.4th at p. 863; see *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 480 [fact that employee had been criticized was "not dispositive proof of the legitimacy of his termination" when "[t]he criticisms were counterbalanced by [recent] compliments"—a reasonable jury "could conclude that [the employer's] articulated reasons for terminating Flait's employment are not worthy of credence"].)

In short, the Board did not offer legitimate, nonretaliatory reasons for the adverse actions alleged by the freshmen plaintiffs. Its stated reasons for Mackey's suspension, Smith's resignation, and Williams's release at most raise contested factual issues and do not entitle it to summary adjudication on their race discrimination claims under title VI and the Unruh Act.

48

3.      *Freshmen Plaintiffs' Claims for Retaliation under Title VI*

Each of the freshmen plaintiffs allege that Jennum retaliated against them in violation of title VI when they opposed actions they viewed as discriminatory. Specifically, they allege Jennum's retaliation began after Mackey complained to the athletic director. As we explain, the court erred in granting summary adjudication as to the retaliation claims brought by Mackey, Williams, and Smith. Summary adjudication was proper as to the retaliation claim brought by Hicks.

Title VI provides a right of action for a plaintiff alleging retaliation for protected activity taken in response to intentional discrimination. (See *Jackson v. Birmingham Board of Education* (2005) 544 U.S. 167, 173 [retaliation for complaining about sex discrimination is a form of intentional sex discrimination under title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.]; *Gebser v. Lago Vista Independent School Dist.* (1998) 524 U.S. 274, 286 [title IX was modeled after and parallels title VI except that it prohibits sex discrimination, not race discrimination, and applies only in education programs, not all programs receiving federal funds]; *Cannon v. University of Chicago* (1979) 441 U.S. 667, 696 ["The drafters of title IX explicitly assumed that it would be interpreted and applied as title VI . . . ."].)

A plaintiff "who has complained of or opposed conduct that [she] reasonably believes to be discriminatory" may bring a retaliation claim even if a court later determines the underlying conduct was not actually discriminatory. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1043.) "Strong policy considerations support that rule" (*ibid.*); it avoids

49

deterring unsophisticated employees from opposing conduct they reasonably and in good faith believe to be discriminatory.

To show a prima facie case of retaliation at *trial*, each plaintiff bears the burden to show (1) she engaged in a protected activity; (2) CSUSM subjected her to an adverse action, and (3) a causal link existed between the protected activity and CSUSM's action. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.) If the plaintiff establishes a prima facie case, the burden shifts to CSUSM to offer a legitimate, nonretaliatory reason for the adverse action. If CSUSM does so, the presumption of retaliation drops, shifting the burden back to the plaintiff to prove intentional retaliation. But as we have explained, the Board bears the burden as the party seeking summary judgment to establish that plaintiffs *cannot* establish a prima facie case of retaliation, or that there was a legitimate, nonretaliatory reason for the adverse action. (*Serri*, *supra*, 226 Cal.App.4th at pp. 861–862.)

The trial court granted summary adjudication on the freshmen plaintiffs' retaliation claims because it did not find (1) a protected activity as to Smith and Hicks; (2) an adverse action as to Mackey; or (3) a causal link between the two as to Williams. Our analyses of the adverse action requirement for discrimination and any legitimate, nondiscriminatory reasons for those actions apply with equal force to the retaliation claim. As explained, the court construed the adverse action requirement too narrowly; on our record, there is a triable issue as to each freshman plaintiff with respect to that requirement. Likewise, any evidence of legitimate, nondiscriminatory reasons for those adverse actions do not entitle the Board to summary adjudication at this juncture.

Accordingly, we limit our inquiry to whether the Board showed the freshmen plaintiffs could not establish one of the other two elements of a prima facie case, protected activity and causal link. In doing so, we bear in mind that "[r]etaliation claims are inherently fact-specific, and the impact of an employer's action in a particular case must be evaluated in context." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1052.)

"Courts consistently have recognized that in enacting antiretaliation provisions, legislators sought to protect a wide range of activity in addition to the filing of a formal complaint." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1047, fn. 7; *Nazir*, *supra*, 178 Cal.App.4th at p. 287 [plaintiff's complaints over the years "about numerous things" to his supervisor and *about* his supervisor "are considered sufficient opposition to trigger the prohibition against retaliation"].) Three of the four freshmen plaintiffs complained about what they perceived to be Jennum's discriminatory behavior.[25] Mackey met with athletic director Milo around November 12 to express her view that Jennum was singling out the African-American freshmen on the team; Jennum joined their meeting.[26] Jennum responded by putting every player on the spot to weigh in on whether she was a racist. Williams and Smith spoke up, telling Jennum she did appear to discriminate against some players or

---

[25]   There was no contention before the trial court or on appeal that the plaintiffs did not reasonably or in good faith make these complaints. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1043.)

[26]   As noted, Milo's assertion that Mackey stated "she did not think that this treatment was related to her race" merely creates a contested issue of fact.

treat some players differently.[27]  Circumstantial evidence indicates Jennum understood their remarks as complaints of race-based differential treatment, given her response that she had used the term "the group" during the walkathon sarcastically.

Critically here, as in *Elliott*, "there is evidence that [Jennum] ratcheted up the pressure on [the freshmen plaintiffs] after hearing that [they] had directly accused [her] of racism."  (*Elliott*, *supra*, 879 F.Supp.2d at p. 448.)  Mackey came off the injured list in November but did not receive playing time despite being cleared by both her doctors. Jennum started to separate her more from her teammates during drills.  Mackey followed her initial complaint with more protected activity.  Sometime after the "Am I racist?" meeting, she contacted Dean Perez.  She, Jennum, and Perez had a three-way meeting in late November.  When communication did not improve, Mackey went back to Perez, who told her to contact CSUSM's title IX coordinator.  Eventually, Mackey fell a credit behind and was suspended for academic reasons that she attributes to stress from Jennum's treatment.

Williams was told not to practice dribbling or shooting because it was "noisy"; it came to a point where she "was literally just standing there on the side of practice for two hours, doing absolutely nothing."  After November, Jennum would only let her participate in team punishments, like "suicide" sprints.  Jennum told her in late November that she would be lumped together and treated the same as the company she kept, which

---

27    Because we rely on Smith's comments during the "Am I racist?" meeting, we do not reach her other argument, challenged by the Board, that she complained about not getting sufficient playing time.

Williams took as an instruction not to be friends with Mackey. Williams was offered the rare chance to practice with the team on December 18 because "regular players were injured." During that practice, coaches "commended [her] on how well [she] was going and indicated that [she] was making good progress." Nevertheless, Jennum cited performance as the reason to release her the next day.

Smith felt that after the November meeting, Jennum yelled at her more, corrected her more, pulled her out of drills, and canceled five of her one-on-one meetings. Overall, "the treatment got worse." When she asked why she was only playing 30 seconds per game, Jennum responded that she lacked a "fire" in her without explaining what she could do to improve. [28] Smith quit the team because Jennum's treatment only seemed to get worse after Mackey complained.

Mackey and Williams did not file a formal complaint of race discrimination until January 2014, after both had left the team. But that does not mean, as the Board claims, that they "made no protected complaint about race discrimination until *after* they [left] the team." Evidence that Jennum "ratcheted up the pressure" after Mackey, Williams, and Smith each spoke out before or at the "Am I racist?" meeting is sufficient to establish "both the protected activity and the 'causal link' necessary for establishing a retaliation claim." (*Elliott*, *supra*, 879 F.Supp.2d at p. 448.) Certainly, the Board did not meet its burden as the moving party to establish that these three plaintiffs could *not* make such a

---

[28] We question the extent to which Smith can rely on limited playing time to prove her retaliation claim, given her testimony that she "only started getting played after complaints [against Jennum] were made." Smith's testimony suggests she received *more* playing time after protected activity by her and her teammates.

showing.  Accordingly, summary adjudication was not proper as to Mackey, Williams, and Smith on their title VI retaliation claims.

We reach a different result as to Hicks.  During her deposition, she described Jennum treating her and the other African-American players more harshly.  But she *specifically denied* making any complaints about it:

> "[Q.]  Did you ever tell Coach Jennum that you thought . . . she . . . gave others more chances than you?
>
> "[A.]  Did I ever tell her?
> "[Q.]  Yeah.
>
> "[A.]  No, I didn't.
>
> "[Q.]  Did you ever tell anybody?
>
> "[A.]  I talked to my dad.
>
> "[Q.]  Anybody else?
>
> "[A.]  No."
>
> [¶] . . . [¶]
>
> "[Q.]  Did you ever communicate to anybody about these times when you felt Coach Jennum treated the African-American players differently . . . ?
>
> "[A.]  No."

In their opening brief, plaintiffs claim Hicks spoke up at the "Am I racist?" team meeting. Hicks's deposition testimony contradicts this contention. She testified that the whole team started talking at once before Jennum could elicit her opinion.[29]

Plaintiffs also urge, accurately, that Hicks gave Mackey permission to speak to Milo on her behalf and use her name. Even if such a theory is viable, *notice* to CSUSM is key. "Standing alone, an employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination." (*Yanowitz*, *supra*, 36 Cal.4th 1028, 1046.) "Although an employee need not formally file a charge in order to qualify as being engaged in protected opposing activity," and might adequately convey her message through " 'inartful, subtle, or circumspect remarks,' " the employee's communications must " 'sufficiently convey [her] reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.' " (*Id.* at p. 1047.)

Hicks's testimony forecloses a jury finding that she personally made a complaint, and there is no evidence that *Mackey* told Milo and Jennum that she was complaining on Hicks's behalf. Moreover, on our record, Hicks cannot defeat summary adjudication by arguing she *could* produce evidence at trial as to what Mackey conveyed, or argue that

---

29    Plaintiffs rely on an inadmissible hearsay statement within McLean's report to suggest Hicks did, in fact, speak up at that meeting.

Jennum retaliated based on a faulty *perception* that Hicks, too, had complained.[30] Such

arguments cannot be made because Hicks denied at deposition that she ever faced

adverse consequences *because of* someone else's complaint:

> "[Q.] Do . . . you believe that the university or Coach Jennum made
> any types of decisions or treated you any differently because your
> friends, Lynette [Mackey] and Kianna [Williams], had complained
> about Coach Jennum?
>
> "[A.] Not necessarily, but I feel like since I'm associated with them
> and they're my group of friends, whatever happens to them could
> also come back on me. And being that this is about race and I've
> seen it and experienced it and hear about it from being with them as
> my group -- as my friends, then it affects me also.
>
> [¶] . . . [¶]
>
> "[Q.] Well, . . . do you believe the university or any of the coaches
> or the athletic department treated you any differently or made any
> decisions about you because of the complaints that Kianna and
> Lynette . . . made?
>
> "[Counsel:] Objection. Compound.
>
> "[A.] No.
>
> "[Q.] When you said that -- because you're associated with them
> you thought maybe things that happened to them would come back
> on you, what did you mean --
>
> "[A.] Not come back on me, but I just . . . speaking back on, like
> history basically, African-Americans always had to work their way
> up.

---

30    Other jurisdictions have denied summary judgment to retaliatory discharge claims
where an employer *perceived* an employee to have engaged in protected activity, whether
or not she actually engaged in such activity. (See, e.g., *Fogleman v. Mercy Hosp.* (3d
Cir. 2002) 283 F.3d 561, 571−572; *Johnson v. Napolitano* (D.D.C. 2010) 686 F.Supp.2d
32, 36.) Based on our independent review, it appears California courts have yet to
address the viability of this "perception" theory of retaliation.

Elsewhere, Hicks testified that she believed Jennum released Williams in retaliation for comments she had made. But when asked whether she felt Jennum "was trying to get rid of [her]," Hicks responded:

> "No, because I was more the quiet one so I . . . could see everything that happens. I'll have my little incidents that happened with her, but it wasn't -- it wasn't as much as the other players. They -- they have more problems with her."

Based on her deposition testimony, the Board met its moving burden to show that Hicks could not establish a prima facie claim of retaliation under title VI. Given her admission that she never made complaints or faced consequences from her teammates' complaints, no reasonable jury could conclude that she suffered retaliation for engaging in protected activity. Her admission negates any causal link between complaints made by others and Jennum's adverse treatment of Hicks. Accordingly, summary adjudication was proper as to the title VI retaliation claim brought by Hicks.

57

DISPOSITION

The judgment is reversed.  The matter is remanded with instructions that the trial court vacate its order granting summary judgment and enter a new order granting summary adjudication as to the following claims:  (1) all causes of action brought by Danielle Cooper; (2) all causes of action under sections 1981 and 1983 as to all plaintiffs; and (3) the cause of action for retaliation under title VI brought by plaintiff Crystal Hicks.  The new order shall deny summary adjudication as to the remaining claims.  Plaintiffs are entitled to their costs on appeal.


                                                                                    DATO, J.
WE CONCUR:


HALLER, Acting P. J.


IRION, J.